MAPCO INC.

v.

The UNITED STATES.

No. 287–74.

United States Court of Claims.

June 15, 1977.

J. W. Bullion, Dallas, Tex., atty. of record, for plaintiff. Buford P. Berry and Thompson, Knight, Simmons & Bullion, Dallas, Tex., of counsel.

Patricia B. Tucker, Washington, D. C., with whom was Acting Asst. Atty. Gen. Myron C. Baum, for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before DAVIS, Judge, SKELTON, Senior Judge, and KASHIWA, Judge.

### OPINION

PER CURIAM:

This tax refund action comes before the court on plaintiff's and defendant's exceptions and briefs to the recommended decision of Senior Trial Judge Mastin G. White, which he has submitted in accordance with Rule 134(h) on August 25, 1976. Neither party has taken exception to any of the trial judge's proposed findings of fact; however, both parties have taken exception to the trial judge's recommended conclusion of law. Upon consideration of the parties' briefs and after having heard oral argument, the court agrees with the trial judge's opinion and findings and adopts the same, with the following modifications, as the basis for its judgment in this case.[1]

---

1. The trial judge's findings of fact, copies of which have been distributed to the parties, are not printed because those essential to the decision appear in the opinion which follows.

### Pipeline Revenues

To reach his recommended conclusion of law that the transaction in issue did not correspond with the concept of a sale, the trial judge focused upon two ultimate facts: that the plaintiff obligated itself to produce future pipeline revenues (T.J. op. 16) and that the transaction was contrived solely for income tax purposes (T.J. op. 17). However, we believe that more important than these facts are the facts that Rock Creek was only to receive a sum certain at an interest rate which approximated the standard prevailing rate; that Rock Creek had no risk of eventual nonpayment; that Rock Creek had none of the usual risks or benefits associated with ownership of property; that Rock Creek had no dominion or control over the revenue payments; that Mapco was not free to do as it wished with the proceeds of the transaction; and that Mapco indirectly secured the repayment of Rock Creek's loan to Chemical Bank.

The three participants in the instant transaction are: Mapco, the plaintiff-taxpayer; Chemical Bank; and Rock Creek. On December 22, 1966, the participants executed the documents necessary to effectuate the transaction. Plaintiff, in return for $4 million in cash, assigned to Rock Creek a 75 percent interest in its future, unearned revenues until such time as Rock Creek had received $4 million plus interest on the outstanding balance. The $4 million which Rock Creek paid to the plaintiff was borrowed by Rock Creek from Chemical Bank; as security for the loan from Chemical Bank, Rock Creek assigned only its interest in plaintiff's future revenues to the bank. Contemporaneously with the above transaction, plaintiff used the $4 million received to purchase certificates of deposit issued by Chemical Bank. The maturity dates of the certificates of deposit were selected to coincide with the anticipated dates for the repayment to Chemical Bank of the $4 million borrowed from that bank by Rock Creek.

Chemical Bank held plaintiff's certificates of deposit. After receiving notification from plaintiff about every two weeks, the bank would deposit the proceeds from the matured certificates into plaintiff's account and then transfer enough from that account to pay Rock Creek its profit margin and to credit the remainder against the outstanding balance of the bank's loan to Rock Creek and the interest due on such loan.

Rock Creek did not report the pipeline revenues as income when earned by Mapco, but only treated the interest differential, viz., three-eights of 1 percent, as income. Also, Rock Creek never notified the customers of Mapco that the pipeline revenues had been assigned. In 1966 plaintiff reported the $4 million as income for tax purposes only; on its financial statements, plaintiff included the relevant pipeline revenues as income in 1967. Although plaintiff admits that it did not need or use the $4 million for any business purpose, except to create in 1966 taxable income to offset a net operating loss carryover which otherwise was scheduled to expire, defendant does not claim that the transaction was devoid of legal effect or that the consideration received was inadequate.

■ We have considered carefully all the evidence in this case. Although the various transactions were constructed with an obviously meticulous attention to detail, we agree with the trial judge that the assignment by Mapco to Rock Creek of its future revenues, in substance, was not a bona fide sale. Whether a bona fide sale has occurred depends not upon the form of the transaction but upon its substance.[2] In other words, we are merely employing the established principle that in resolving such questions as whether there was a sale, the court can consider motive, intent and conduct in addition to what appears in written instruments used by the parties to control rights among themselves.[3] After exam-

---

2. *Higgins v. Smith*, 308 U.S. 473, 477–78, 60 S.Ct. 355, 84 L.Ed. 406 (1940).

3. *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 454 note 3, 70 S.Ct. 280, 94 L.Ed. 251 (1950); *Commissioner of Internal Revenue v. Tower*, 327 U.S. 280, 289–91, 66 S.Ct. 532, 90 L.Ed. 670 (1946); *Helvering v. Clifford*, 309 U.S. 331, 335–37, 60 S.Ct. 554, 84 L.Ed. 788 (1940); *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 255, 60 S.Ct. 209, 84 L.Ed. 226 (1939).

ining the extrinsic evidence behind the assignment of revenues in this case, we believe that the transaction merely produced a loan-type investment secured by the right to future revenue. This is not to say that the assignment was invalid between the parties or that it was devoid of legal effect. We merely are saying that the transaction was not an economically real sale and, therefore, cannot be recognized as a sale for tax purposes.

We recognize that a transaction will not be disregarded merely because it was entered into for tax-saving motives if it otherwise has real substance.[4] Since a taxpayer is free to use all lawful means to decrease taxes that he would otherwise be required to pay, the mere fact that an otherwise bona fide transaction was entered into to save taxes does not affect its validity for tax purposes. We also recognize that a taxpayer may sell a property right to future income. If the bona fide sale occurs at arm's length for adequate consideration, the seller is taxed in the year of sale on the amount of consideration he actually receives and the buyer is taxed on any excess of income received over his purchase price.[5] However, if the purported sale of future income is not bona fide, the "seller" cannot include in current income the amount he was paid for "selling" his future income. Instead, he is taxed on that income in the later year when it is collected and paid to the "buyer."

In determining whether the instant transaction was a bona fide sale, we have concentrated on the economic substance of the transaction rather than the mere form in which it was cast. To us, the facts that valuable consideration was present and that the assignment had legal effect between the parties are insufficient to show that a substantive sale occurred. We readily admit that the distinction is narrow between selling a property right to future income and assigning anticipated income as collateral to secure financing. Nevertheless, we feel that the distinction seems logically and practically to turn upon an out-and-out economically realistic transfer of a substantial property interest. Where the line of demarcation should finally be placed we need not try to anticipate here.[6] But we are certain that distinctions attempted on the basis of the various legal names given a transaction, rather than on its actual results between the parties, do not afford a sound basis for delimitation.

As we interpret the facts of this case, the assignment was actually in the nature of a nonrecourse secured loan. Because Rock Creek was to receive 75 percent of Mapco's pipeline revenues until it received $4 million, the transaction appears to be a loan for that amount. Further, although Rock Creek had no rights against Mapco, Mapco had a consistent record of earning pipeline revenues, of which Rock Creek and Chemical Bank were aware. Since Rock Creek had the right to receive payments until it was repaid, even if Mapco's revenues declined, Rock Creek was certain to be repaid eventually. This certainty of repayment is more characteristic of a loan than a sale.[7] Further evidence that the risks were at most minimal is the fact that the interest rate calculated on the basis of the period of

---

4. *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

5. *Wilkinson v. United States*, 304 F.2d 469, 472–73, 157 Ct.Cl. 847, 855–56 (1962); *Cotlow v. Commissioner of Internal Revenue*, 228 F.2d 186 (2d Cir. 1955).

6. As stated by Mr. Justice Stone in *Harrison v. Schaffner*, 312 U.S. 579, 583, 61 S.Ct 759, 762, 85 L.Ed. 1055 (1941):
   " * * * 'Drawing the line' is a recurrent difficulty in those fields of the law where differ-

ences in degree produce ultimate differences in kind." * * *

7. The validity of a sale of income is enhanced where the claim is contingent, doubtful and uncertain. *Jones v. Commissioner of Internal Revenue*, 306 F.2d 292 (5th Cir. 1962). Although Rock Creek's claim against Mapco was not contingent, we view this fact as merely an additional argument against the commercial substance of the transaction to be a sale of income.

repayment was the then standard prevailing interest rate. Had the transfer involved risks of ownership one would expect a higher interest factor. Cumulatively, these factors lead us to the inescapable conclusion that there is no difference between the transaction in question and a nonrecourse secured loan at prevailing interest rates. In other words, the consideration was not consideration for a sale but principal loaned to a debtor.

In addition to the fact that the transaction bore a negligible risk factor, which evinces that it lacked commercial substance as a sale, the fact that Mapco deposited the $4 million proceeds in Chemical Bank certificates of deposit implies that Mapco indirectly guaranteed repayment. Although we understand the assignment contract specified that Mapco was not personally liable to Chemical Bank for Rock Creek's loan and the Rock Creek and Chemical Bank—as assignee of Rock Creek's rights under the Mapco-Rock Creek assignment— would look to the transferred future pipeline revenue for their return, we do not feel that the certificates of deposit were merely a handsel to Chemical Bank from Mapco. Quite the contrary, by depositing in Chemical Bank the proceeds of the Mapco-Rock Creek transaction, Mapco indirectly assured Chemical Bank that it would comply with the assignment of revenue agreement. Moreover, rather than directly underwrite the Chemical Bank-Rock Creek loan, Mapco indirectly ensured or sponsored that loan by converting its proceeds into those certificates. The maturity dates of the certificates of deposit were specifically selected to coincide with the anticipated dates for the repayment to Chemical Bank of the $4 million borrowed from that bank by Rock Creek. Nevertheless, plaintiff points to its other creditors and suggests that they, not Chemical Bank, required the proceeds of the transaction to be deposited into a form so that Mapco could not spend the proceeds prematurely to their detriment. We recognize that those creditors played an important role for Mapco to acquire certificates of deposit; however, those creditors did not mandate that Mapco acquire Chemical Bank certificates. And, we do not subscribe to plaintiff's theory that it acquired Chemical Bank certificates on its own volition. The exhibits to the record evidence an understanding between Mapco and Chemical Bank that Mapco would acquire that bank's certificates. We believe that this understanding was vital to the whole transaction. While holding the proceeds of the transaction, Chemical Bank, as assignee of Rock Creek's rights, would be in a much better legal position to redress its rights against Mapco, should Mapco default in its obligation to Rock Creek, than if an independent third party held the proceeds of the Mapco-Rock Creek transaction. The hypothecation of the $4 million was, in our opinion, an integral part of the whole transaction, which precluded Mapco from doing with the proceeds as it wished.

Lastly, we point to those facts which demonstrate to us that Rock Creek had no dominion or control over the revenue payments and had none of the usual risks or benefits associated with ownership of property. It should first be noted that the pipeline revenues were never paid to Rock Creek. Instead, the bank, upon notification by plaintiff, would transfer an amount from plaintiff's regular account to credit Rock Creek with its profit margin and to credit the outstanding balance of and interest due on the bank's loan to Rock Creek. In light of the other facts of this case, we think that this transfer arrangement has more significance than mere convenience for the parties. We think it adds to the evidence on record which demonstrates that Rock Creek did not consider itself owning a property interest. When Rock Creek negotiated this transaction, it was interested in only its fee, the three-eights of 1 percent interest differential. Since it viewed no risk on repayment, Rock Creek considered its profit margin to be determined by how long Mapco took to pay off the $4 million. Rock Creek did not consider itself having purchased an economic property interest in future revenues since it neither notified Mapco's customers of the assignment nor reported the pipeline revenues as income

when earned by Mapco. As a result, on its federal income tax returns Rock Creek treated only this interest differential as income.[8]

Based on all the facts of this case, which we have examined cumulatively, having focused on no one fact, we agree with the trial judge that the assignment by Mapco to Rock Creek of its future revenues lacked commercial substance to be a bona fide sale. Accordingly, the plaintiff's exceptions with relation to this issue are overruled and the petition is dismissed as to such claim.

■ With relation to the issue concerning damage payments, since the court agrees with the trial judge's recommended decision, without modification, defendant's exceptions are overruled. It is therefore concluded that plaintiff is entitled to recover on its claim relating to damage payments, and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

The trial judge's opinion, hereinabove modified by the court, follows:

## OPINION OF TRIAL JUDGE

WHITE, Senior Trial Judge:

The plaintiff, a common carrier of petroleum products through an interstate pipeline system, sues for the recovery of income taxes and interest which the plaintiff paid to the Internal Revenue Service on or about September 6, 1972, in accordance with deficiency assessments made by the IRS against the plaintiff for the years 1967 and 1968.

For the years involved in the present litigation, the plaintiff's books of account were maintained, and its tax returns were filed, on the accrual basis and on the basis of a year that ended on December 31.

The case presents two legal questions for determination by the court:

(1) The first question is whether, for income tax purposes, the plaintiff is entitled to investment credit under 26 U.S.C. §§ 38 and 46–49 with respect to payments made by the plaintiff to landowners and tenants as compensation for damage done to crops, etc., in the course of constructing pipelines across lands owned or leased by the payees.

(2) The second question is whether a lump sum which the plaintiff received in exchange for an assignment of future pipeline revenues constituted, for tax purposes, income to the plaintiff as of the time when the lump sum was received.

### Damage Payments

During the years involved in these proceedings, the plaintiff constructed various pipelines across lands which were owned in fee by other persons and which, in some instances, were occupied by tenants. The pipelines were constructed on 50-foot right-of-way easements previously acquired by the plaintiff from the owners of the particular lands.

The normal sequence of events whereby the plaintiff acquired a right-of-way easement across a particular parcel of land and constructed a pipeline thereon was as follows: first, the plaintiff purchased the easement and obtained a conveyance of it from the landowner; and then, at a later time, the plaintiff cleared and graded the surface of the land within the boundaries of the right-of-way, dug a ditch for the pipeline, and laid the pipeline.

A right-of-way easement was customarily purchased for a consideration that included a nominal lump sum (e.g., $5.00) plus a sum calculated on the basis of an agreed amount per rod for the linear length of the right-of-way. Upon paying the agreed lump sum and "roddage" to the landowner, the plaintiff received from the landowner, through a formal document of conveyance, a perpetual easement "to construct, maintain, inspect, operate, protect, repair, replace, change the size of, or remove a pipeline or pipelines, * * * within the confines of a

**8.** Bookkeeping entries and income tax returns, although evidence of the facts which they purport to record, are not conclusive. *Helvering v. Midland Mut. Life Ins. Co.,* 300 U.S. 216, 223,

57 S.Ct. 423, 81 L.Ed. 612 (1937); *Doyle v. Mitchell Bros. Co.,* 247 U.S. 179, 187, 38 S.Ct. 467, 62 L.Ed. 1054 (1918).

right of way 50 feet in width, * * * for the transportation of natural gas, oil, petroleum products or any other liquids, gases or substances which can be transported through a pipeline, * * * over, under, through and across" certain land described in the document of conveyance.

The document conveying a right-of-way easement to the plaintiff customarily contained the following provision that has special significance in the present case:

> Grantee [plaintiff] agrees to pay to the then owners and to any tenant, as their interests may be, any and all damages to crops, timber, fences, drain tile, or other improvements on said premises that may arise from the exercise of the rights herein granted. * * *

When the time came for the plaintiff to utilize an easement by clearing and grading the surface of the land within the boundaries of the particular right-of-way, by digging a ditch for the pipeline, and by laying the pipeline, such activities on the part of the plaintiff generally caused damage to crops, timber, fences, drain tile, or other improvements on the parcel of land where the work was performed. By virtue of the provision in the document of conveyance that is quoted in the immediately preceding paragraph of this opinion, the plaintiff was obligated to pay, and did pay, the landowner (and the tenant, if any) for all such damages. For example, the damage payments totaled $27,600 in 1967 and $425,484 in 1968.

In its income tax returns, the plaintiff claimed investment credits in the amounts of $1,932 for 1967 and $29,783.88 for 1968 on the basis of the damage payments previously mentioned. These amounts were disallowed by the Internal Revenue Service, and the propriety of the administrative action is questioned by the plaintiff in the present litigation.

The parties are in agreement that the question of whether the plaintiff is entitled to investment credits on the basis of the damage payments that are involved in the present litigation depends, in turn, upon: (1) whether the damage payments should be regarded as part of the cost of obtaining the right-of-way easements, which are intangible assets (*Panhandle Eastern Pipe Line Co. v. United States*, 408 F.2d 690, 697–98, 187 Ct.Cl. 129, 139–40 (1969)) and are therefore outside the scope of the provisions of the Internal Revenue Code authorizing investment credit in certain situations (see 26 U.S.C. § 48(a)(1)); or (2) whether such payments should be regarded as part of the cost of constructing the pipelines, which are tangible assets and provide a proper basis for investment credit.

The problem of whether damage payments of the sort involved here should be classified as easement costs or construction costs was considered by another court in *Tenneco, Inc. v. United States*, 433 F.2d 1345 (5th Cir. 1970). In that case, the court reached the following conclusion (at 1349):

> We conclude that the damage amounts are properly attributable to the cost of the easements. * * * We note that the obligation to pay such amounts is incurred in the easement contract, even though the actual payment is generally triggered by the construction * * * of the pipeline. The construction of the pipeline and the damages incurred result from utilization of the easement for which taxpayer contracted. We think that the key lies in the fact that the damage amounts *are paid to the landowner for utilization of the contractual easement.* They are primarily easement costs, and only secondarily costs of the construction of the pipeline. [Emphasis in original.]

The plaintiff in the present case contends (not unexpectedly) that the court's conclusion in *Tenneco* was erroneous. With all due respect to the other court, it is my opinion that the present plaintiff has the better logic on its side in urging that dam-

age payments are an integral part of the cost of constructing a pipeline, rather than part of the cost involved in acquiring right-of-way easements for the pipeline.

In the usual situation, the purchase of a right-of-way easement across a parcel of land is an entirely separate transaction—and is chronologically removed—from the making of a damage payment to the landowner (or tenant).[1] Normally, the plaintiff first pays the landowner the lump sum and the "roddage" that they have agreed upon as the purchase price for the right-of-way easement, and the landowner thereupon executes a formal document of conveyance granting a perpetual right-of-way easement to the plaintiff. The easement vests in the plaintiff at that time; and the vesting is not contingent in any way upon the actual construction of a pipeline on the right-of-way at a later time, resulting in an additional payment to the landowner (and tenant, if any) for damages. It is only if—and when—the plaintiff subsequently utilizes the easement, by clearing and grading the land within the right-of-way, digging a ditch for the pipeline, and laying the pipeline, that the plaintiff becomes obligated to pay the landowner (and tenant, if any) for the damages occasioned by the plaintiff's *construction* activities. Logically, it seems that such damage payments are as much a part of the cost of constructing the pipeline as is the expense incurred by the plaintiff in purchasing pipe for the pipeline.

Accordingly, as the damage payments made by the plaintiff constituted pipeline construction costs, the Internal Revenue Service Erred in denying the plaintiff investment credit with respect to such payments; and the plaintiff is entitled to recover on this aspect of its claim.

### Pipeline Revenues

For the year 1966, the plaintiff had a net operating loss carryover of approximately $4,700,000 that would expire at the end of that year if not offset by income earned in 1966, and it also had a carryover loss of approximately $548,034 that would expire at the end of 1967 if not offset by income earned in 1966 or 1967. It was anticipated by the plaintiff that the taxable income from its operations in 1966 would offset only about $1,600,000 of the carryover loss that would otherwise expire at the end of 1966. Plaintiff's management was, quite naturally, concerned over the possible expiration of the large loss carryovers, and explored possible methods of realizing income to offset the losses.

After considering and rejecting various other alternatives, the plaintiff's management began to investigate the possibility of selling to someone the right to receive future pipeline revenues in exchange for a lump-sum payment in 1966, which could be listed as 1966 income for income tax purposes in order to offset the net operating loss carryover that would otherwise expire at the end of 1966. Such a possibility first occurred to Robert E. Thomas, chief executive officer of the plaintiff. Mr. Thomas was familiar with the procedure through which the plaintiff and other companies had previously acquired interests in mineral properties in the form of carved-out production payments.

In a carved-out production payment, the owner of mineral-producing property sells to another person, for a stated price, an interest in the minerals in place. Thereafter, as the minerals are extracted, the purchaser of the mineral interest receives (in the typical situation) a specified percentage of the production revenues until such time as he shall have received a designated principal sum, plus an amount equivalent to interest at a stated percentage.

The plaintiff's management ultimately decided that, as a means of realizing income to offset the loss carryover for 1966, the

---

1. In some instances, future damages are estimated and paid for at the time when the easement is purchased.

plaintiff would endeavor to make a sale of future pipeline revenues in exchange for a lump-sum payment to be received in 1966. Mr. Thomas thereupon approached William J. Sherry, president and principal shareholder of Rock Creek Corporation ("Rock Creek"), and inquired about the willingness of Mr. Sherry to act, through Rock Creek, as the purchaser in such a transaction. Mr. Sherry, either personally or through corporations which he controlled, had long been involved in the acquisition of oil and gas production payments.

From the outset, Mr. Sherry was interested in the proposal that his corporation, Rock Creek, acquire a pipeline revenue payment from the plaintiff. However, a substantial period of time was required for the specific details of the transaction to be agreed upon by the interested parties.

After being approached by Mr. Thomas concerning the possible acquisition of a pipeline revenue payment from the plaintiff, Mr. Sherry conferred on several occasions with officials of Chemical Bank New York Trust Company ("Chemical Bank"), with which Mr. Sherry and his corporations had done business through the years, regarding the possibility of obtaining from that bank funds with which to finance the acquisition of the proposed pipeline revenue payment.

By May of 1966, Mr. Thomas, the chief executive officer of the plaintiff, had been brought into the negotiations with Chemical Bank; by late November of 1966, the details of a transaction involving the plaintiff, Rock Creek, and Chemical Bank had been agreed to; and on December 22, 1966, the various formal steps to effectuate the transaction were taken by the several parties, as outlined in the succeeding numbered paragraphs of this opinion.

(1) On December 22, 1966, the plaintiff and Rock Creek entered into a formal agreement that was evidenced by a document entitled "Assignment of Pipeline Revenues." This document declared that the plaintiff, in exchange for the sum of $4,000,000 paid by Rock Creek, "hereby sells, transfers, assigns and sets over" to Rock Creek 75 percent of all pipeline revenues accruing to the plaintiff after 7 a.m. on December 30, 1966, and continuing until such time as Rock Creek received the principal sum of $4,000,000, plus an amount equal to interest at the rate of 6⅝ percent per annum on the unliquidated balance of the principal sum, plus reimbursement for expenses incurred by Rock Creek up to a maximum amount of $3,750. The document also declared that "Buyer [Rock Creek] shall look solely to Assigned Pipeline Revenues for liquidation and discharge of the Pipeline Revenue Payment and Seller [plaintiff] shall not be personally liable for the payment thereof * * *." However, the plaintiff obligated itself in the agreement to continue to operate its pipeline system properly during the life of the agreement, and to use its best efforts not only to maintain pipeline revenues at the then-current level but to increase them if possible. (In this connection, projections of the plaintiff's future monthly income had been prepared in early December of 1966, and such projections indicated that the transaction would be fully liquidated by July of 1967.)

(2) The $4,000,000 which Rock Creek paid to the plaintiff was borrowed by Rock Creek from Chemical Bank. The borrowing was evidenced by Rock Creek's promissory note of December 22, 1966, bearing interest at the rate of 6 percent per annum and being secured by an assignment of Rock Creek's right, title, and interest in the pipeline revenue payment from the plaintiff.

(3) The $4,000,000 which the plaintiff received from Rock Creek was used by the plaintiff contemporaneously to acquire certificates of deposit from Chemical Bank. The certificates of deposit ranged in amount from $125,000 to $312,500, they bore interest at the rate of 5.1 percent per annum, and they were to mature at 2-week intervals beginning February 16, 1967, and ending June 1, 1967. The maturity dates of

the certificates of deposit corresponded with the anticipated dates for the repayment to Chemical Bank of the $4,000,000 which Rock Creek borrowed from the bank.

Chemical Bank held the certificates of deposit, and was directed by the plaintiff to deposit the proceeds to the plaintiff's account as each certificate matured. Also, an arrangement was made whereby Chemical Bank, upon being notified by the plaintiff every 2 weeks of the amount of pipeline revenues earned during the preceding period, was authorized to transfer 75 percent of such amount from the plaintiff's account, to credit Rock Creek with its profit margin of ⅜ths of 1 percent, and to credit the remainder against the outstanding balance of the bank's loan to Rock Creek and the interest due on such loan.

The $4,000,000 payment which the plaintiff received from Rock Creek on December 22, 1966, was reported by the plaintiff in its income tax return for 1966 as income realized during that year, and it was used as an offset against the net operating loss carryovers previously mentioned. Subsequently, in 1967, as 75 percent of the plaintiff's pipeline revenues were paid over to Rock Creek in accordance with the assignment of December 22, 1966, the plaintiff did not report that portion of its revenues as income for tax purposes. The plaintiff's income tax return for 1967 showed that no tax was due. The Internal Revenue Service took a different view of the matter, however, and held that all the pipeline revenues earned by the plaintiff in 1967 were taxable in that year. The IRS assessed against the plaintiff income tax in the amount of $580,669.67, plus interest in the amount of $155,118.34, for the year 1967; and these amounts were duly paid by the plaintiff.

In two cases with facts similar in all substantial respects to those of the present case, the Court of Appeals for the Fifth Circuit affirmed, without discussion, decisions by the Tax Court to the effect that attempted sales of future revenues for lump-sum payments were ineffective to produce income for the purported sellers as of the times when the lump-sum payments were received. One of the cases, *Martin v. Commissioner of Internal Revenue*, 56 T.C. 1255 (1971), *affirmed*, 469 F.2d 1406 (5th Cir. 1972), involved a purported sale of future rents by the owner of an apartment building. The other case, *Hydrometals, Inc. v. Commissioner of Internal Revenue*, 31 TCM 1260 (1972), *affirmed*, 485 F.2d 1236 (5th Cir. 1973), *cert. denied*, 416 U.S. 938, 94 S.Ct. 1940, 40 L.Ed.2d 289 (1974), involved a purported sale of future manufacturing revenues by a manufacturing company.

On the other hand, the Court of Appeals for the Sixth Circuit has held that a sale of future dividends by an owner of corporate stock for a lump-sum payment should be recognized for income tax purposes as resulting in income to the seller when the lump-sum payment was received. *Estate of Stranahan v. Commissioner of Internal Revenue*, 472 F.2d 867 (6th Cir. 1973).

The principal difference between the *Stranahan* case, on the one hand, and the *Martin* and *Hydrometals* cases, on the other hand, is that in *Stranahan* the seller of the future income was not under any obligation whatever to produce such income for the benefit of the purchaser, who was compelled to look solely to a third person (the corporation which issued the stock) for the future income that he had purchased, whereas in the *Martin* and *Hydrometals* cases the purported sellers of future income were themselves obligated to produce future income for the benefit of the purported buyers. Thus, in substance, the transactions in the *Martin* and *Hydrometals* cases were more like loans that were to be repaid, with interest, by borrowers out of their own productive efforts, than like true sales agreements.

As previously stated, the facts in the present case are similar in all substantial

respects to those of the *Martin* and *Hydrometals* cases. Here, the plaintiff was obligated to produce the future pipeline revenues that Rock Creek was to receive under the agreement of December 22, 1966. Although the plaintiff did not, in terms, guarantee the repayment of the $4,000,000 principal sum to Rock Creek, plus the interest equivalent of 6⅜ percent, plus reimbursement for Rock Creek's expenses, the plaintiff, in substance, obligated itself to such a program. The plaintiff specifically obligated itself to continue to operate the pipeline system properly during the life of the agreement, and also obligated itself to use its best efforts not only to maintain the pipeline revenues at their then-current level (which would be sufficient to liquidate the transaction by July 1967) but to increase such revenues, if possible. Thus, when the agreement of December 22, 1966, was entered into, it was certain, as a practical matter, that the plaintiff would itself repay the $4,000,000 principal sum, plus the interest equivalent, plus reimbursement for Rock Creek's expenses, within a matter of several months. The agreement of December 22, 1966, therefore, was more in the nature of a loan-and-repayment transaction than it resembled a sale-and-purchase transaction.

Moreover, it is at least worthy of some consideration that the transaction of December 22, 1966, was contrived solely for income tax purposes. The plaintiff did not need or use the $4,000,000 which it received from Rock Creek for any business purpose, except the attempt to create in 1966 taxable income to offset the net operating loss carryover which otherwise was scheduled to expire at the end of 1966.

It is my opinion that the Internal Revenue Service did not err in refusing to recognize the December 22, 1966, transaction between the plaintiff and Rock Creek as affecting the plaintiff's income for tax purposes.

### CONCLUSION OF LAW

Upon the trial judge's findings and opinion, which are adopted by the court as modified, the court concludes as a matter of law that the plaintiff is entitled to recover on its claim relating to damage payments, together with interest as provided by law, and judgment is entered to that effect. The amount of the recovery will be determined in subsequent proceedings pursuant to Rule 131(c).

The court further concludes as a matter of law that the plaintiff is not entitled to recover on its claim relating to the purported sale in 1966 of future pipeline revenues, and the petition is dismissed as to such claim.