## TRANSWESTERN PIPELINE COMPANY

v.

## The UNITED STATES.

### No. 455–76.

United States Court of Claims.

Nov. 19, 1980.

---

13. 5 U.S.C. § 5596 (1976).

14. *Jankowitz v. United States, supra* note 12, 209 Ct.Cl. at 504, 533 F.2d at 547.

Marvin K. Collie, Houston, Tex., attorney of record, for plaintiff; Donald F. Wood,

Glen A. Rosenbaum, and Vinson & Elkins, Houston, Tex., of counsel.

Robert N. Dorosin, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Jr., and Donald S. Olson, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and KASHIWA * and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision (including an opinion, findings of fact, and conclusions of law) filed by Trial Judge Mastin G. White. After hearing oral argument and considering the government's exceptions and the briefs of the parties, as well as the record as a whole, the court hereby adopts the trial judge's findings and opinion, as supplemented by the following, as the basis for its judgment in the case.[1]

The government's attack on the trial judge's findings of fact and conclusions of law is based on its contention that the line pack gas in issue constituted an inventory of merchandise held for sale by the taxpayer in the normal course of business, and its argument that in view of the determination by the Commissioner of Internal Revenue to that effect, the Commissioner's ruling should be upheld on the basis of the Supreme Court's decision in *Thor Power Tool Company v. Commissioner*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979).

For the following reasons, we find that *Thor* is not applicable to the facts of this case, and that the trial judge's findings of fact and his conclusions of law are supported by undisputed evidence and by the applicable law:

1. The line pack gas in issue, in the sense of a constant volume of gas, but not in the sense of specific molecules of gas, is

---

\* The concurring opinion of Judge Kashiwa follows the opinion of the trial judge which has been adopted by the court.

1. Although the court adopts the trial judge's findings, they are not printed herewith since his opinion and this *per curiam* opinion set forth the facts necessary for an understanding of the decision.

an indispensible and, in substance, an integral part of the pipeline system, just as the pipe in the pipeline, or the compressors or any other essential component without which the pipeline system cannot operate.

2. Upon the abandonment of the gas transmission system at the end of its useful life, the vast majority of the line pack would be lost and only a small fraction thereof would be economically recoverable at that time.

3. Taxpayer's line pack gas meets the definition of a fixed asset under generally accepted accounting principles and the capitalization and depreciation of the cost thereof conforms to the best accounting principles in the natural gas industry and to the Federal Power Commission's Uniform System of Accounts during the period involved in this case. Also, the capitalization and depreciation of the line pack clearly reflects the income of the plaintiff and comes within the matching concept of accounting by matching the company's expenses with its related income in each taxable period throughout the useful life of the pipeline system.

4. The position taken by the Internal Revenue Service regarding the treatment of the line pack gas is inconsistent with its position in Rev.Rul. 75–233, 1975–1 C.B. 95, regarding cushion gas stored in subsurface reservoirs. We find no meaningful distinction between the economically unrecoverable gas in this case and the unrecoverable gas covered by that ruling.

By contrast, we find that the facts and circumstances involved in the *Thor* case are so distinctly different from those presented in this case that *Thor* is not applicable here.

In *Thor*, it was an uncontested fact that the property in issue consisted of an inventory of goods held for sale at original prices. The Supreme Court specifically found that Thor's procedures for writing down its excess inventory were plainly inconsistent with the regulations applicable to the treatment of an inventory of such merchandise and failed to clearly reflect income. By contrast, it is established, and not disputed in this case, that the taxpayer has never maintained any natural gas in an inventory account for Federal income tax, financial accounting, or Federal Power Commission regulatory purposes. The trial judge properly concluded on the basis of the uncontradicted evidence referred to in paragraphs 1 and 2 above, that the line pack is not an inventory item, but instead is a basic capital asset which is an integral part of the pipeline system. Here also, the plaintiff met its burden of showing that its treatment of the line pack gas clearly reflected income, whereas treatment of the line pack as inventory would not do so but would distort taxpayer's income. Consequently, we conclude as did the trial judge, that the Commissioner's ruling that the line pack should be treated as an inventory of goods held for sale in the normal course of business was arbitrary and represented an abuse of his discretion.

Accordingly, the court finds that plaintiff's line pack gas is tangible personal property, the cost of which should be treated for income tax purposes as a capital expenditure which is depreciable over the useful life of the system. Therefore, plaintiff is entitled to recover to the extent determined by the trial judge, plus interest at the statutory rate, and judgment is entered to that effect. The amount of recovery is reserved for further proceedings before the trial judge pursuant to Rule 131(c).

OPINION OF THE TRIAL JUDGE

WHITE, Senior Trial Judge:

Transwestern Pipeline Company ("Transwestern" or "plaintiff"), a regulated carrier of natural gas through an interstate pipeline system, sues for the refund of federal income taxes which the plaintiff paid for the calendar years 1964, 1965, and 1966, in accordance with deficiency assessments made by the Internal Revenue Service against the plaintiff.

The basic issue in the case is whether the cost of the line pack gas in an interstate natural gas pipeline transmission system should be treated, for income tax purposes, as a capital expenditure and thus as depre-

ciable over the useful life of the system (this being the plaintiff's position), or as an inventory expense and thus as non-depreciable (the defendant s position).

It appears—rather surprisingly—that this issue has not been presented for judicial decision in any previous case.

A newly constructed natural gas pipeline system cannot be tested operationally and placed in regular service until it is filled with natural gas at a pressure sufficiently high to allow the system to operate at a level that will meet the contractual delivery requirements of the pipeline's customers. An equivalent volume of gas must be present in the pipeline at all times thereafter in order to maintain the required pressure and thereby accomplish the uninterrupted flow of gas to customers. This essential *volume* of gas, which must be in the pipeline system before it can be tested operationally and placed in regular service, and which must constantly be maintained in the system at all times thereafter in order to accomplish the delivery of gas to customers, is commonly referred to as "line pack."

Transwestern was formed for the purpose of building a natural gas pipeline system that would deliver to Southern California natural gas acquired in the Southwest. The construction of Transwestern's pipeline system was completed in 1960, and the system was placed in regular service on October 1, 1960.

During the period that is involved in the present case, Transwestern's pipeline system included a main line, two lateral lines, and numerous gathering lines. The main-line pipeline extended from Roswell, New Mexico, to Needles, California, a distance of 670 miles. One of the lateral pipelines ran from Puckett, in West Texas, to Roswell; and the other lateral line ran from Pampa Junction, in the Texas Panhandle, to Roswell. Attached to each of the lateral pipelines were numerous smaller gathering pipelines owned and operated by Transwestern for the transmission of natural gas from gas wells or gas processing plants to the lateral line.

Transwestern gathered its natural gas by means of purchases from gas producers and from gas processing plants located in the Anadarko Basin area of the Texas and Oklahoma Panhandles, and in the Permian Basin area of West Texas and Southeast New Mexico. Purchases of natural gas from producers involved the delivery and injection of natural gas into Transwestern's gathering lines at the wellheads of producing wells. Purchases of natural gas from gas processing plants involved the delivery and injection of natural gas into Transwestern's gathering lines at the tailgates of gas processing plants. Title to the gas passed to Transwestern upon delivery at the wellhead of a producing well or at the tailgate of a processing plant.

During the years involved in the present litigation, Transwestern's largest customer was Pacific Lighting Gas Supply Company ("Pacific Lighting"), which, through related corporations, distributed natural gas in the Southern California retail market. Transwestern delivered the gas to Pacific Lighting at the terminal point of Transwestern's main-line pipeline in Needles, California. The service agreement dated August 8, 1960, between Transwestern and Pacific Lighting required that Transwestern deliver the natural gas to Pacific Lighting at a pressure of 800 pounds per square inch, gauge, and at a rate of 300 million cubic feet per day.

The natural gas was moved through Transwestern's pipeline system to the point of delivery by the use of compressors, located at various points along the route of the system. The function of a compressor is to receive natural gas from the next immediate upstream segment of a pipeline, to compress the gas, and then to release the gas into the next immediate downstream segment of the pipeline at a pressure in excess of the pressure at which the gas was received.

During the years involved in the present case, Transwestern's pipeline system was—and it still is—a so-called "base load" system. Such a system is one which normally operates at a constant flow rate and deliv-

ers a constant volume of gas throughout the year.

The injection of line pack gas into the Transwestern pipeline system during 1960 was required in order for the pipeline to be operationally tested and to be placed in regular service on October 1, 1960. The evidence in the record indicates that when the Transwestern system began regular service on October 1, 1960, the volume of line pack in the system was somewhere between 1.50 billion cubic feet and 1.72 billion cubic feet (plus from 1 percent to 3 percent, representing the line pack in lateral lines).

In connection with the matter of the amount of line pack in Transwestern's pipeline system, it probably should be mentioned that during the course of an audit by the Internal Revenue Service of Transwestern's income tax returns for the company's taxable years 1960–1965, the IRS and Transwestern entered into a compromise computation which indicated that, during the years mentioned, Transwestern had 1,617,-647 thousand cubic feet ("mcf") of natural gas as line pack, which cost an average of 17 cents per mcf, or a total of $275,000.

The volume of line pack in Transwestern's pipeline system has not varied appreciably since the system was placed in regular service on October 1, 1960. A constant volume of line pack, equivalent to that initially injected into Transwestern's pipeline system during 1960, has necessarily been maintained in the system at all times since October 1, 1960, in order for the system to operate and to accomplish the delivery of natural gas to customers.

For federal income tax reporting purposes, the cost of the line pack injected into and subsequently maintained in Transwestern's pipeline system was capitalized and depreciated by Transwestern over the remaining useful life of the pipeline system, which was estimated to be 28.5 years as of October 1, 1960, when the system was placed in regular service.

The Internal Revenue Service, upon auditing Transwestern's income tax returns for the years 1960 through 1966, disallowed Transwestern's claimed depreciation deduc-

tions with respect to line pack. As a result of net operating losses sustained by Transwestern in the taxable years 1960 through 1963, the disallowance of the deductions concerning line pack resulted in deficiencies only for the taxable years 1964, 1965, and 1966. These deficiencies, plus interest, were duly paid by Transwestern. Claims for refund was timely filed by Transwestern, and were denied by the Internal Revenue Service. The present litigation followed.

As previously indicated, the basic issue to be decided by the court is whether (as contended by Transwestern) the cost of the line pack in Transwestern's pipeline system should be treated for income tax purposes as a capital expenditure and thus as depreciable over the useful life of the system, or whether (as contended by the Government) the cost of the line pack should be treated as an inventory expense and thus as non-depreciable.

Section 167 of the Internal Revenue Code of 1954 (26 U.S.C.) deals with the subject of depreciation deductions for income tax purposes. Subsection (a) of this section states the general rule to be in part as follows:

> There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business * * *.

A natural gas pipeline system, including the essential line pack in the system, is, of course, "property used in the trade or business" of the pipeline company.

However, subsection (b) of section 1231 of the 1954 Code, which is the portion of the code dealing with capital gains and losses, contains in paragraph (1) a definition of the term "property used in the trade or business" which provides in part as follows:

> The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, * * * which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, [or]

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *.

According to the statutory framework, therefore, inventory or property held primarily for sale to customers in the ordinary course of a taxpayer's trade or business is an exception to the general rule that any property used in a taxpayer's trade or business is a capital asset which may be depreciated for income tax purposes.

In the sense of a constant *volume* of gas which must be maintained in Transwestern's pipeline system at all times, line pack is an indispensable and, in substance, an integral part of the pipeline system. The delivery of natural gas from the system is dependent on a minimum pressure level prevailing in the system at all times; and this, in turn, is dependent on the presence of line pack in the system. The system will not deliver gas at the contractual requirements of Transwestern's customers unless the line pack is constantly present. If the line pack were to be removed from any segment of Transwestern's pipeline, the entire system would become inoperative.

When the line pack is viewed in the manner outlined in the preceding paragraph, line pack seems to be as much of an integral part of Transwestern's pipeline system— and, therefore, as much a part of the basic capital asset that the pipeline system represents—as the pipe in the pipeline, or the compressors, or any other essential component without which the pipeline system could not operate.

The Supreme Court has said that "established tax principles require the capitalization of the cost of acquiring a capital asset." *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 12, 94 S.Ct. 2757, 2764, 41 L.Ed.2d 535 (1974). Here, the capital asset used by Transwestern in its trade or business is the company's interstate pipeline system. For the system to be operationally tested, to be placed in regular service, and thereafter to

operate, it was necessary for Transwestern to purchase and inject into the system, and thereafter to maintain in the system at all times, a certain volume of natural gas, known as line pack. Without the line pack, the pipeline system would have been inoperable, and the other components of the system (the pipe, the compressors, etc.) would have been completely useless to the plaintiff in its trade or business. From the standpoint of logic, therefore, the cost of purchasing the line pack, like the cost of purchasing the other essential components of the pipeline system, was part of the cost of acquiring the capital asset (*i. e.*, the pipeline system) which Transwestern uses in its trade or business.

Some help on the present problem can be derived from this court's decision in *Mapco Inc. v. United States*, 214 Ct.Cl. 389, 556 F.2d 1107 (1977). The taxpayer in that case was the owner and operator of an interstate pipeline system and, during the course of constructing a pipeline along a right-of-way across lands owned by other persons, caused damage to crops, timber, fences, and other improvements on the lands. As required by the terms of the right-of-way agreements with the landowners, the taxpayer made payments to the landowners (and to tenants in some instances) covering the damages. In its income tax returns for certain years, the taxpayer claimed investment credit on the basis of the damage payments, and these amounts were disallowed by the Internal Revenue Service. The court held that the damage payments constituted pipeline construction costs and that the taxpayer was entitled to investment credit with respect to such payments. The court said (214 Ct.Cl. at 401, 556 F.2d at 1114) in this connection that "Logically, it seems that such damage payments were as much a part of the cost of constructing the pipeline as is the expense incurred by the plaintiff in purchasing pipe for the pipeline."

Moreover, the evidence in the record indicates that as of 1960, when the line pack was initially injected into Transwestern's pipeline system, it reasonably appeared that upon the abandonment of the system at the

end of its useful life, the vast majority of the line pack in the system would be lost, i. e., would necessarily be vented to the atmosphere. Although technical means were known whereby it would be possible to recover the line pack physically, it reasonably appeared that from the standpoint of the cost involved, only a small fraction of the line pack in the system could reasonably have been foreseen as economically recoverable at the end of the system's useful life. Expert witnesses who testified at the trial concerning the ultimate recoverability of the line pack in Transwestern's pipeline system made estimates that ranged from a low of approximately 3 percent to a high of approximately 20 percent. Even if the most generous of these estimates were to be accepted as the correct one, this would still leave something like 1.3 billion cubic feet of line pack to be lost ultimately at the end of the useful life of Transwestern's pipeline system.

Obviously, line pack, as a minimum volume of gas which must always be maintained in Transwestern's pipeline system if it is to operate, and which will not be recoverable to any substantial extent at the end of the system's useful life, can scarcely be regarded as inventory or as property held primarily for sale to customers.

In connection with the point that, except for a small portion, the linepack will not be economically recoverable at the end of the useful life of Transwestern's pipeline system—although there are techniques through which it could be recovered physically—consideration might be given to this court's opinion in *Southern Natural Gas Co. v. United States*, 188 Ct.Cl. 302, 412 F.2d 1222 (1969). In that case, the court dealt with (among other issues) the question of whether the taxpayer, a natural gas pipeline company, would be allowed to depreciate survey costs, and other costs involved in acquiring a right-of-way easement for the pipeline, as part of the pipeline construction costs. The Internal Revenue Service had determined that the easement acquisition costs could not be depreciated because (according to the IRS) the easement had an indefinite useful life, inasmuch as it was possible for the easement to be used again after the current pipeline wore out or became obsolete. However, the court held that the pipeline company was entitled to depreciate the right-of-way acquisition costs, and said (188 Ct.Cl. at 320, 412 F.2d at 1233), "Almost anything involving future applicability is, of course, possible, or at least technically conceivable, but depreciation allowances are based on estimates grounded upon reasonable probabilities and practical considerations."

Certified public accountants with extensive experience in connection with the natural gas industry testified as expert witnesses for the plaintiff. According to their uncontradicted testimony: line pack meets the definition of a fixed asset under generally accepted accounting principles, and, therefore, the cost of line pack should be capitalized and depreciated over the useful life of a pipeline system; the capitalization and depreciation of line pack conforms to the best accounting practices in the natural gas industry; the capitalization and depreciation of line pack clearly reflects the income of the plaintiff; the capitalization and depreciation of line pack comes with the matching concept of accounting, by matching the company's expenses with its related income in each taxable period throughout the useful life of the pipeline system; treating line pack as an item of inventory would not be in accordance with generally accepted accounting principles; and treating line pack as inventory would not clearly reflect the income of the plaintiff, but it would distort income.

It should also be mentioned, in connection with the treatment of Transwestern's line pack from the accounting standpoint, that Transwestern is an interstate pipeline company and is subject to regulation by the Federal Power Commission. The FPC regulates the rates at which Transwestern sells natural gas to customers. There is uncontradicted expert accounting testimony in the record to the effect that under FPC's Uniform System of Accounts, as it was in effect during the period that is involved in the present case, line pack would properly

be included as part of the account entitled "Gas Plant in Service," and, therefore, would be depreciated. Line pack would not fall within any definition of an inventory account under the FPC's Uniform System of Accounts, according to the expert accounting testimony.

For FPC regulatory accounting purposes, Transwestern did capitalize and depreciate the 1960 cost of the line pack gas as part of the original cost of its "Gas Plant." This was not objected to by the FPC on its cost audit of Transwestern; and the undepreciated portion of the line pack cost has been included in Transwestern's rate base for FPC regulation purposes throughout the company's existence.

It should be noted that the position taken by the Internal Revenue Service with respect to Transwestern's line pack seems inconsistent with the position taken by the IRS in Rev.Rul. 75–233, 1975–1 C.B. 95. That ruling involved a corporation which was involved in the operation of a natural gas pipeline transportation system. The factual situation (as explained in the ruling) was that in order to meet the fluctuating seasonal demands of its customers for gas, the corporation acquired the right to store natural gas in a subsurface reservoir. During the summer months, when the demand for gas was slack, gas was injected into the subsurface reservoir for storage. Then, during the winter months, gas was withdrawn from the storage reservoir to supplement the gas deliveries of the pipeline.

In holding that the cost of the portion of the injected gas which constituted so-called "cushion gas" was a capital expenditure and, therefore, was depreciable for income tax purposes, the IRS stated (1975–1 C.B. at 96) in part as follows:

> The gas to be injected during the useful life of the storage reservoir consists of unrecoverable gas and recoverable gas. The unrecoverable gas is the volume of injected gas which it is established will remain permanently in place in the reservoir pore space at conditions of reservoir pressure and saturation initially projected for reservoir abandonment. The excess of total injected gas over unrecoverable gas is deemed to be recoverable gas.

> \* \* \* \* \* \*

> The unrecoverable gas in the instant case is tangible property in the nature of a permanent improvement or betterment made to adapt the reservoir to the storage of gas. \* \* \*

> Accordingly in the instant case the cost of the natural gas injected into the underground reservoir and determined to be unrecoverable is a capital expenditure \* \* and is recoverable through allowances for depreciation provided by section 167 of the Code and the regulations thereunder.

There is evidence in this record showing that line pack gas in a transmission pipeline is functionally similar to "cushion gas" in an underground storage reservoir, in that: (1) both a pipeline and an underground storage reservoir are receiving natural gas which will be transported from a source of supply to a market; (2) both a pipeline and an underground storage reservoir depend on natural gas being present to provide the pressure necessary for the operation; (3) during the useful life of both a pipeline and an underground storage reservoir, there is a complete molecular interchange between the initial line pack gas or cushion gas and the gas being delivered to customers (although the interchange is more rapid in a pipeline that in an underground storage reservoir); and (4) both the line pack gas in a pipeline and the cushion gas in an underground storage reservoir are unrecoverable, except to a minor extent, at the end of the useful life of the respective facilities.

In contending that line pack gas should be regarded as inventory or property held primarily for sale to customers in the ordinary course of Transwestern's trade or business, the defendant insists, in effect, that consideration should be focused on the specific molecules of natural gas injected into and delivered from Transwestern's pipeline system. It must be conceded, in this connection, that all the natural gas molecules in Transwestern's pipeline system at any given moment of time (except those in the system at the end of its useful life) are

ultimately destined for delivery to customers in the ordinary course of Transwestern's trade or business.[1]

As volumes of natural gas are delivered at the terminal delivery point of Transwestern's pipeline system, they must be—and they are—instantaneously replaced by identical volumes of gas being injected into the system through inlets to the system. Consequently, the gas molecules in the system are in a constant state of movement and replacement as gas is delivered to customers at the downstream end of the system and an equivalent volume of gas is taken into the system at the upstream end. Thus, under normal operating conditions, the natural gas molecules that are physically present in the pipeline system at any given moment of time are not static, but are in a process of continuous and steady movement from the points of origin toward the point of delivery to Transwestern's customers.

For present purposes, however, the important consideration seems to be that the *volume* of gas in the pipeline system that is necessary for the operation of the system—*i. e.*, the line pack—remains constant while the process of receiving natural gas molecules from the sources of supply and delivering natural gas molecules to customers is in progress. Also, the line pack will be lost (except perhaps for some minor salvage value) at the end of the system's useful life because of the lack of any economically feasible means of recovering any significant portion of the line pack upon the abandonment of the system. These factors lead to the conclusion that line pack is not inventory or property held primarily for sale to customers.

The defendant regards the present case as one that involves essentially an accounting problem, and states in its brief that the resolution of the issue before the court concerning the proper income tax treatment of line pack gas "is governed by Section 446 of the Internal Revenue Code of 1954 * * *, which contains the general rule for methods of accounting, Section 471 * * *, which sets forth the general rule for inventories, and Section 1231(b)(1) * * *, which defines depreciable property used in the trade or business as excluding inventory."

Section 1231(b)(1) of the 1954 Code has previously been referred to in the opinion.

Although section 446 of the 1954 Code states in subsection (a) the general rule that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books," subsection (b) provides as an exception to the general rule that "if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." [2]

Section 471 of the 1954 Code provides as follows:

Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.[3]

It has been mentioned previously in the opinion that, under the method of accounting regularly used by Transwestern in keeping its books, the costs of line pack was treated as a capital expenditure and was depreciated over the remaining useful life of Transwestern's pipeline system.

---

1. Insignificant amounts of gas in the system are used as compressor fuel, or are occasionally vented to the atmosphere for various reasons. However, these quantities are so small that, for the purpose of this discussion, it may be considered that all of the gas in the system, except that in the system at the end of its useful life, will ultimately be delivered to customers.

2. The version of section 446(b) in effect during the years involved in this case contained the phrase "or his delegate" after the word "Secretary."

3. During the years involved here, section 471 also contained the phrase "or his delegate" after the word "Secretary."

The authority of the Secretary of the Treasury (or his delegate, the Commissioner of Internal Revenue) to require that Transwestern change its method of accounting for line pack as a capital expenditure and adopt the method of accounting for line pack as an inventory expense would depend, first, upon a determination that Transwestern's method of accounting for the cost of line pack as a capital expenditure does not clearly reflect the company's income and, second, upon a further determination that accounting for line pack as an inventory expense would (a) conform to the best accounting practices in the natural gas industry and (b) most clearly reflect Transwestern's income.

As stated earlier in the opinion, there is uncontradicted expert accounting testimony in the record showing that Transwestern's accounting method of capitalizing and depreciating the cost of line pack clearly reflects Transwestern's income and also conforms to the best accounting practices in the natural gas industry. Consequently, administrative action taken by the Internal Revenue Service, purportedly under the authority of sections 446 and 471 of the 1954 Code, to require a change by Transwestern in its method of accounting for the cost of line pack would be arbitrary and illegal. As this court said in *Morgan Guaranty Co. of New York v. United States*, 218 Ct.Cl. 57, 72, 585 F.2d 988, 997 (1978), "where there is no distortion of income or potential for distortion under a method of tax accounting * * *, it is an abuse of the Commissioner's discretion to switch a taxpayer's method of tax accounting to a different method."

It has also been mentioned that Transwestern's method of accounting for the cost of line pack as a capital expenditure was in accordance with the Uniform System of Accounts prescribed by the Federal Power Commission as the agency regulating the interstate natural gas industry. Compliance with the FPC's accounting requirements in this respect "is almost presumptively controlling the federal income tax consequences." *Commissioner v. Idaho Power Co., supra*, 418 U.S. at 15, 94 S.Ct. at 2765.

Moreover, if (as previously concluded) the cost of the line pack—like the cost of the pipe, the compressors, and the other components essential to the establishment and maintenance of the pipeline system—constituted part of Transwestern's cost of acquiring the pipeline system, then Transwestern had a statutory right under section 167 of the 1954 Code to depreciate the cost of the line pack. This statutory right could not, of course, be withdrawn or defeated through any administrative action by the Internal Revenue Service.

For the reasons previously indicated, it is my opinion that the cost of the line pack in the plaintiff's natural gas pipeline system constituted a capital expenditure and, for income tax purposes, was depreciable over the useful life of the system. It necessarily follows that the plaintiff is entitled to recover in the present litigation.

In connection with a determination of the amount of the plaintiff's recovery under Rule 131(c), it must be noted that the plaintiff depreciated the entire cost of the line pack on the theory that it would be wholly lost and would have no salvage value at the end of the pipeline system's useful life. The evidence in this record shows that, on the contrary, it reasonably appeared at the time when the line pack was injected into the plaintiff's pipeline system that the line pack would have some minor salvage value at the end of the system's useful life. According to the expert testimony on this point, it reasonably appeared that it would be economically feasible to recover between 3 percent and 20 percent of the line pack upon the ultimate abandonment of the pipeline system. A "jury verdict" to the effect that the line pack should be regarded as recoverable and salvageable to the extent of 12 percent would seem to be appropriate for present purposes, and this is included in the findings of fact.

KASHIWA, Judge, concurring in result:

I concur with the result reached by the per curiam opinion of the majority, but I feel the *Thor Power* line of accounting

cases granting deference to the Commissioner's accounting determinations must be more thoroughly discussed. The majority approach assumes there is no *Thor Power* problem here because the majority decides the characterization question, *i. e.*, whether line pack is "inventory" or a "capital asset," first. Thus, because line pack is not inventory, the Commissioner is in error and, *ergo*, his determination is entitled to no weight. The majority's approach, it seems to me, assumes what it must decide. I therefore have chosen to concur in result, explaining what I perceive to be the necessary analysis.

During the years in question, the plaintiff depreciated the cost of the gas necessary to completely fill the pipeline prior to operation. An equal volume of this gas, or line pack, must always be present for the pipeline to operate. The line pack is virtually unrecoverable when pipeline operations end. The Commissioner of Internal Revenue disallowed the depreciation deductions after concluding such deductions do not clearly reflect Transwestern's income. The Commissioner recomputed Transwestern's income by including the line pack costs in inventory. This suit eventually followed.

The Government asserts that *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), and related cases require that we hold for defendant. Simply stated, it is the Government's contention that as this is an accounting problem, the Commissioner's determination is entitled to great deference under *Thor* and its predecessors. *E. g., Lucas v. American Code Co.*, 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930); *Brown v. Helvering*, 291 U.S. 193, 203, 54 S.Ct. 356, 360, 78 L.Ed. 725 (1934); *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 189–190, 77 S.Ct. 707, 712–13, 1 L.Ed.2d 746 (1957); *American Automobile Association v. United States*, 367 U.S. 687, 697–698, 81 S.Ct. 1727, 1732, 6 L.Ed.2d 1109 (1961); *Schlude v. Commissioner*, 372 U.S. 128, 133–134, 83 S.Ct. 601, 604, 9 L.Ed.2d 633 (1963). The Government's argument continues that while generally accepted accounting principles and regulatory accounting practices are

of relevance, they are by no means dispositive of whether a taxpayer's accounting methods clearly reflect income, as the Internal Revenue Code mandates. *American Automobile Association*, 367 U.S. at 690, 693, 81 S.Ct. at 1730; *Frank Lyon Co. v. United States*, 435 U.S. 561, 577, 98 S.Ct. 1291, 1300, 55 L.Ed.2d 550 (1978); *Thor*, 439 U.S. at 541, 99 S.Ct. at 785. *See Commissioner v. Idaho Power*, 418 U.S. 1, 15, 94 S.Ct. 2757, 2765, 41 L.Ed.2d 535 (1974). The Supreme Court, the Government says, has consistently recognized that divergence occurs between tax and financial accounting when a taxpayer seeks a current deduction for future losses, *e. g., Commissioner v. Hansen*, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959) (deduction to establish reserve for anticipated nonperformance of guaranty disallowed); *Brown v. Helvering*, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1934) (deduction to establish reserve for potential liabilities due to anticipated insurance policy cancellations disallowed); *Lucas v. American Code Co., supra* (deduction to establish reserve for potential liability on contested lawsuit disallowed). Divergence between tax and financial accounting also occurs, the Supreme Court has recognized, when an accrual basis taxpayer seeks to avoid current inclusion despite present receipt, *e. g., American Automobile Association, supra* (prepaid club dues presently includible despite financial attribution to later periods when "earned"); *Schlude, supra* (prepaid dance lesson fees presently includible although financial attribution proper to later years when lessons actually taught). Thus, the Government concludes, because the Commissioner has determined this line pack must be treated as inventory to clearly reflect income, and because a taxpayer's heavy burden is not met merely by showing his method concurs with generally accepted accounting principles or regulatory accounting practices, these depreciation deductions must be disallowed under Treas.Reg. § 1.167(a)–2 (1956).

With this analytic framework, I have no disagreement. The issue here is whether Transwestern's method of accounting for

line pack costs (depreciation) clearly reflects income. That is an accounting question under sections 446(b) and 471 of the Code and must be dealt with as such as the primary matter. *All-Steel Equipment, Inc. v. Commissioner*, 467 F.2d 1184, 1185–1186 (7th Cir. 1972). The Code provides no other framework. Nor do the cases of the Supreme Court interpreting sections 446(b) and 471 and their predecessors under the 1939 Code. To decide this case, therefore, we must look beyond a simply choice of "inventory" or "capital asset." Instead, *before* reaching the characterization issue, we must recognize that deference be shown the Commissioner's determination that Transwestern's method of accounting does not clearly reflect income and that use of accepted financial accounting or regulatory principles, without more, will not control. The Supreme Court requires no less.

Even within this framework of deference to the Commissioner, this is a close case. Two factors, however, convince me that this taxpayer has met the heavy burden necessary to reverse a determination that a method of accounting does not clearly reflect income.

First, the plaintiff has demonstrated through expert testimony that line pack gas is essentially similar to cushion gas used to line underground reservoirs. Under Rev. Rul. 75–233, 1975–1 Cum.Bull. 95, the cost of cushion gas is to be capitalized and then depreciated; while under Rev.Rul. 68–620, 1968–2 Cum.Bull. 199, and Rev.Rul. 78–352, 1978–2 Cum.Bull. 168, the cost of line pack is not depreciable and, instead, is subject to inventory accounting. Apparently, the rate of molecular interchange between line pack gas and all gas injected afterwards is faster than the rate of molecular interchange between cushion gas and gas injected afterwards. However, the relative rates of molecular interchange are an inadequate basis on which to require radically different accounting treatments for purposes of the federal income tax. This inadequate distinction alone allows the plaintiff recovery, for it is settled law here and elsewhere that the Commissioner's determinations must not be arbitrary. *E. g., Morgan Guaranty*

*Trust Co. v. United States*, 218 Ct.Cl. 57, 72, 585 F.2d 988, 997 (1978).

Second, the plaintiff's expert witnesses testified that only depreciation of the line pack cost would clearly reflect income. The Government, significantly, did not rebut this testimony with that of its own expert witnesses. Such testimony, of course, is only of limited value in determining the ultimate legal conclusion, *i. e.*, whether a given accounting method clearly reflects income. I feel, however, that such testimony by Government experts would have more clearly explained the Commissioner's determination that depreciation of the line pack cost is not clearly reflective of income. I view this failure as significant. *Missouri Baptist Hospital v. United States*, 213 Ct.Cl. 505, 515–517, 555 F.2d 290, 296–297 (1977).

I conclude, therefore, that on these peculiar facts depreciation of the line pack cost clearly reflected Transwestern's income for the years before us. Plaintiff is entitled to recover to the extent determined by the trial judge, plus interest at the statutory rate.