**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-2775
_____

MERCK & CO., INC.,

Appellant

v.

UNITED STATES OF AMERICA

_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 2-05-cv-2575)
District Judge: Honorable Katharine S. Hayden
_____

Argued March 24, 2011

Before: FUENTES, SMITH, and GREENBERG, *Circuit
Judges*

(Opinion Filed: June 20, 2011)

Charles W. Hall
William S. Lee
Nancy T. Bowen
Tom C. Godbold
Reagan M. Brown
Fulbright & Jaworski, L.L.P.
1301 McKinney, Suite 5100
Houston, TX  77010

Jonathan S. Franklin (argued)
Tillman J. Breckenridge
Fulbright & Jaworski, L.L.P.
801 Pennsylvania Ave., N.W.
Washington, D.C. 20004
        *Attorneys for Appellant*

John A. DiCicco
Gilbert S. Rothenberg
Kenneth L. Greene
Judith A. Hagley (argued)
Tax Division
Department of Justice
P.O. Box 502
Washington, D.C. 20044
        *Attorneys for Appellee*

---
OPINION OF THE COURT
---

Fuentes, *Circuit Judge*:

Plaintiff Schering-Plough, Inc.[1] brings this action against the United States for recovery of nearly $500 million in taxes it claims the IRS incorrectly assessed against it. It argues, first, that the funds it received as a result of two transactions were not, as the IRS contends, immediately taxable in full as proceeds of loans from foreign subsidiaries; and, second, that it suffered disparate treatment in comparison with another taxpayer who engaged in similar transactions but was not assessed taxes on the proceeds in the same way. The United States prevailed on both claims in the District Court, and Schering-Plough timely appealed. For the reasons given below, we will affirm the District Court's decision on both claims.[2]

**I.**

---

[1] During the course of this action, Schering-Plough purchased Merck, Inc., and the combined entity is now known as Merck. For the sake of consistency with the prior opinions in this case, we shall continue to refer to plaintiff as Schering-Plough.

[2] The District Court had jurisdiction under 28 U.S.C. § 1346(a)(1). We have jurisdiction under 28 U.S.C. § 1291.

## A. Background

In the early 1990s, Schering-Plough, a New Jersey pharmaceuticals company, was the ultimate owner of two Swiss subsidiaries, Scherico and Limited. These subsidiaries conducted significant manufacturing operations in Ireland, which, at the time, had a favorable corporate income tax. Each of the subsidiaries held significant cash reserves. Scherico had a modest amount of earnings not yet taxed in the United States, whereas Limited had earnings of nearly $1 billion untaxed in the United States.

Schering-Plough wished to make use of those cash reserves to engage in certain business activities, such as a stock repurchase program. However, Subpart F of the Internal Revenue Code, 26 U.S.C. §§ 951-965, which governs the taxation of the income of U.S.-owned foreign subsidiaries, dictates that, while such income is not taxable in the United States when earned, it *is* subject to taxation if it is ever invested in "United States property." Such property is defined to include any debt obligation of U.S. companies. In other words, if a foreign subsidiary of a U.S. company lends or distributes money to its parent, the U.S. company is required to recognize that money as income.[3] Thus, Schering-Plough's subsidiaries, Scherico and Limited, could not simply make a loan or pay dividends to Schering-Plough

---

[3] This is in contrast to the ordinary treatment of loans, which are usually not treated as income for tax purposes. A U.S. company therefore has an incentive to characterize any funds received from a foreign subsidiary as the proceeds of a sale, rather than a loan.

4

without the proceeds being subject to taxation in full that year.

To avoid immediate taxation under Subpart F of the entire sum it wished to repatriate, Schering-Plough consulted Merrill Lynch, an investment bank that had devised other tax-management strategies for Schering-Plough. Merrill Lynch proposed to Schering-Plough a scheme involving interest rate swaps. Under the scheme, Scherico would provide the funds desired to Schering-Plough. In return, Schering-Plough would transfer to Scherico one of Schering-Plough's accounts receivable. To create the receivable for transfer to Scherico, Schering-Plough negotiated an interest rate swap with an accommodating party—Algemene Bank Nederland ("ABN"), a Dutch financial institution. Schering-Plough then assigned its receivable payment stream resulting from this swap to Scherico.

An interest rate swap is a common and legitimate corporate transaction.[4] We draw background information concerning the nature of a swap from the District Court's extensively researched findings. "The counterparties [i.e., Schering-Plough and ABN] agreed to make interest payments to each other based on a notional amount of principal, and [for each] to make payments under a different interest rate for a set term of years. The parties only exchanged the interest payments, not the notional principal [which was used only as the basis of calculating the payments due]. . . . The standardized swap terms permitted ABN and Schering-

---

[4] Swaps are often used, for instance, to hedge away the risk that an interest rate that a company is exposed to will fluctuate in an unfavorable way.

5

Plough to offset (net) the two payments, such that the party owing the higher amount paid only the difference." *Schering-Plough Corp. v. United States*, 651 F. Supp. 2d 219, 229 (D.N.J. 2009).

From the point of view of either party, the swap consisted both of a "pay leg" (the responsibility to pay the other according to the first interest rate designated in the contract) and a "receive leg" (the right to receive payments from the other based on the other interest rate designated in the contract). This swap agreement permitted the assignment of the receive leg to a third party. "Significantly, upon any assignment, the parties could no longer net payments; rather, each periodic payment would be due in full to the party owning the right to the particular income stream . . . . In other words, upon assignment of its receive leg rights, Schering-Plough remained duty-bound to make the entire periodic pay leg distributions to ABN," regardless of whether ABN fulfilled its "parallel obligation to make the payments to Schering-Plough's third-party designee." *Id.* The same applied to ABN; it would have to make its payments to Schering-Plough's assignee regardless of whether Schering-Plough was making payments to it.

At the time Merrill Lynch made its proposal to Schering-Plough, the sale of notional principal contracts such as interest rate swaps was governed by IRS Notice 89-21, which provided that, when a party sells one "leg" of a swap, so that it receives a lump sum in exchange for the right to receive revenues over the remaining life of the swap, that sum should not be recognized as income all at once, but rather

6

should be accounted for over the whole life of the swap.[5] Notice 89-21 specifically stated that "[n]o inference should be drawn from this notice as to the proper treatment of transactions that are not properly characterized as notional principal contracts, for instance, *to the extent that such transactions are in substance properly characterized as loans*." (emphasis added) This notice has since been repealed, and parties are now required to recognize all such payments as loans. 26 C.F.R. §§ 1.446-3(g)(4), h(4)(1).

In accordance with the scheme designed by Merrill Lynch, Schering-Plough entered into a 20-year interest rate swap (with payments at six-month intervals) with a bank, ABN. This swap agreement included a "credit trigger" which allowed ABN to terminate it if Schering-Plough's credit rating was downgraded for more than 60 days. ABN, meanwhile, entered into a "mirror" swap with Merrill Lynch that was essentially designed to perfectly offset the swap with Schering-Plough, as well as compensating ABN for its involvement. That is, to whatever extent ABN might be the loser in the swap with Schering-Plough, it would be the gainer in the swap with Merrill Lynch.[6]

---

[5] In general, parties wish to delay recognition of income for income tax purposes for as long as possible, as this gives them "free use," at least in the short term, of the money that would otherwise be paid as taxes. Therefore, Notice 89-21 dictated a generally favorable tax treatment of such sales.

[6] Essentially, in the "mirror" swap, Merrill Lynch paid ABN a sum calculated with respect to the same interest rate that ABN was already using to calculate its obligation to Schering-Plough, while ABN paid Merrill Lynch a sum calculated with respect to the same interest rate that Schering-

Schering-Plough then assigned the "receive leg" of the swap to Scherico for a lump sum, as was explicitly permitted under the terms of the initial swap.[7]  Scherico also received a

---

Plough was using to determine what it owed ABN.  The Schering-Plough-ABN and ABN-Merrill Lynch swaps were thus designed to cancel each other out, so that (except for a fee for its participation) the economic effect on ABN would be neutral.  (Schering-Plough also paid Merrill Lynch several million dollars for its role in engineering these transactions.)

[7] Actually, Schering-Plough first sold the first five years of the "receive leg" to an unrelated party, Banco di Roma, ostensibly to establish its market value.  Thus, only fifteen years of the "receive leg" were sold to Scherico.

Interestingly, the funds for Banco di Roma to purchase the "receive leg" from Schering-Plough were provided as a zero-coupon certificate of deposit *by ABN*.  ABN had the right to purchase the receive leg from Banco di Roma, and Banco di Roma had the right to sell the receive leg to ABN. Rather than paying periodic interest to ABN, Banco di Roma was compensated for each year that it continued to hold the receive leg.  ABN ultimately purchased the receive leg from Banco di Roma in March 1993, thereby ending its obligation to pay Banco di Roma (as it now held the right to receive funds from itself).  Although the District Court did not need to consider the question, it certainly appears as if "independent third party" Banco di Roma were being compensated to enter into a "sale," with financing provided entirely by ABN, structured to establish the desired "market value" for the remaining years of the swap contract (i.e., the amount that Schering-Plough wished to repatriate).  Once a

8

"put option" which gave it the right to sell the "receive leg" back to Schering-Plough for its current market value at any time.[8] Most of the funds paid over to Schering-Plough, however, were actually channeled from Limited through Scherico (as Limited held most of the untaxed earnings).[9] We will refer to the scheme as a whole as the (first) Transaction.

Thus, initially, Schering-Plough and ABN had reciprocal obligations to each other alone, to pay each other at intervals according to the interest rates defined in each swap agreement. In practice, this meant that the party who was the net loser on the swap would pay the net gainer the difference. But by splitting the normally paired "pay leg" and "receive leg" of the swap, the parties created a triangular relationship among Schering-Plough, ABN, and Scherico. Schering-Plough was obligated to pay ABN at intervals based on a particular interest rate (as defined in the original swap). ABN, meanwhile, was obligated to pay *Scherico* based on another interest rate (because Scherico had been assigned the "receive leg" of the swap from Schering-Plough). Schering-Plough had received a lump sum of money from Scherico in

seemly period of time had passed, ABN effectively nullified the sale, leaving Banco di Roma with a little something in its pocket for its trouble.

[8] Ultimately, the "receive leg" of the first Transaction was repurchased in this fashion, and the swaps were terminated in 2004. It appears that the second Transaction (described below) lacked this explicit put option.

[9] Schering-Plough has stipulated that, if the transactions are characterized as loans, the lender should be deemed to be Limited, not Scherico.

9

exchange for the "receive leg" of the swap. The parties then repeated this transaction (the second Transaction) the following year, but with another Swiss subsidiary of Schering-Plough, Essex Chemie, A.G., replacing Scherico.

This scheme was intended to allow Schering-Plough to report the lump sum it received as income over the life of the swap under Notice 89-21, rather than all at once, as it would have had to under Subpart F if it simply took a loan or dividends from Scherico. That is, instead of accounting for it immediately as an investment in "United States property," Schering-Plough accounted for it as a sale of a leg of a swap, which under Notice 89-21 meant—if the transactions *were not loans* (as Schering-Plough claimed they were not)—that it should be taxed ratably over the life of the Transactions. This was desirable from Schering-Plough's perspective because, as discussed above, a taxpayer generally wishes to delay the recognition of income as long as possible.

Schering-Plough and Scherico did not generate formal loan documentation concerning the transfer of the "receive leg." However, intercompany loans at Schering-Plough generally lacked such documentation. Also, despite a policy requiring that the Board of Directors pre-approve any investment having a maturity of more than one year, Schering-Plough did not seek approval for the Transactions before executing them, as a Schering-Plough witness conceded that it should have if it regarded them as sales rather than loans.

Schering-Plough then reported each of the Transactions to the IRS as a sale, in purported accordance with Notice 89-21. More precisely, beginning in 1996 (to

10

account for the sale of the first five years to an unrelated party), Schering-Plough began reporting a ratable portion of the lump sum paid by Scherico as income. Schering-Plough did *not*, either in 1991 or 1992, report the transactions to the IRS on Form 5471, which is meant to disclose inter-company loans or sales involving foreign subsidiaries (in order to assure compliance with Subpart F).

Ultimately, Schering-Plough repatriated approximately $690.4 million from its subsidiaries through the Transactions.

## B. Procedural history

In 2004, after an audit, the IRS assessed Schering-Plough deficiencies of $472,870,042 for the tax years 1989, 1991, and 1992, on the basis of its conclusion that the Transactions were loans, not sales, and thus immediately taxable under Subpart F. Schering-Plough paid the assessed tax and filed suit in district court seeking a refund, arguing both that it had been treated differently from a similarly-situated taxpayer and that the tax was assessed incorrectly because the Transactions were sales, not loans. The District Court granted the government summary judgment on the disparate-treatment claim. The District Court then held a bench trial at which it heard extensive testimony both from experts provided by both parties and from various individuals who had been involved in the design and execution of the Transactions. After the trial, the District Court found in favor of the government on the tax-refund claim, as well. The District Court held, in a thorough and thoughtful opinion, that the Transactions were, in substance though not in form, loans from the subsidiaries to Schering-Plough, or, in the

11

alternative, that the Transactions had no economic substance and should be disregarded for tax purposes.[10]

Schering-Plough moved for a new trial, and the District Court denied the motion. Schering-Plough now appeals the District Court's holding on both claims.

## II.
## Discussion

We begin by addressing the overarching theme of Schering-Plough's arguments before us: that in reporting the funds it received from its subsidiaries in exchange for the "receive leg" of the ABN swap ratably over the life of the Transactions, it merely complied, as it was required to do, with Notice 89-21. Therefore, it contends, to tax the Transactions as loans would be to ignore Notice 89-21 and disrupt Schering-Plough's legitimate settled expectations as to their tax treatment. However, Notice 89-21 explicitly stated that it did not address the tax treatment of "transactions [that] are in substance properly characterized as loans." If the Transactions were, in fact, loans, then Notice 89-21 simply did not bear on their tax treatment; instead, they should have been treated, like other loans with the same characteristics, as dictated by Subpart F—that is, as fully taxable. Schering-Plough certainly could not have had settled expectations to the contrary. Therefore, whether we affirm the District Court turns simply on whether it accurately characterized the Transactions as loans, not on whether Schering-Plough

_____

[10] Because we uphold the District Court's characterization of the Transactions as loans, we do not reach its alternative conclusion that the Transactions lacked economic substance.

complied with Notice 89-21, or what its expectations were in that regard.[11]

## A. Substance over form

A taxpayer challenging a tax assessment by the IRS as erroneous bears the burden of proof. *See, e.g.*, *Univ. of Pittsburgh v. United States*, 507 F.3d 165, 166 n.1 (3d Cir. 2007). We review the district court's ultimate characterization of the Transactions de novo, and its findings of fact for clear error. "The general characterization of a transaction for tax purposes is a question of law subject to review. The particular facts from which the characterization is to be made are not so subject." *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978).

The District Court's decision rested on its finding that the Transactions were, in substance, loans rather than sales. The District Court held that, under the guise of a one-time payment to Schering-Plough to assume the receive leg of the ABN swap, Scherico actually lent those funds to its parent. Meanwhile, Schering-Plough paid Scherico back over a number of years by itself paying ABN on the "pay leg" of the swap, while ABN paid Scherico on the "receive leg" Scherico

---

[11] Schering-Plough raises a further point, that it is difficult to know what transactions *were* covered by Notice 89-21 if the Transactions were not. Of course, we are not here asked to and need not find that there were no transactions whatsoever that could have qualified for treatment as a sale under Notice 89-21, merely that the transactions in question did not.

13

had been assigned. In other words, Schering-Plough did not repay Scherico directly, but rather used ABN as a passthrough to disguise the nature of the transaction. Although ABN was paying sums to Scherico on the "receive leg" which would often differ from the sums it was receiving from Schering-Plough on the "pay leg," ABN had another swap with Merrill Lynch that was intended to perfectly offset any difference in the two. ABN was even compensated for its participation in the scheme. Therefore, the District Court concluded, the Transactions were nothing but disguised loans. It is this analysis of the Transactions that we review.

The substance of a transaction, rather than its formal characterization, has always dictated its tax treatment. "The Court has never regarded the simple expedient of drawing up papers as controlling for tax purposes when the objective economic realities are to the contrary." *Frank Lyon*, 435 U.S. at 573 (internal quotation marks and citations omitted). "To determine whether a given transaction constitutes a loan, the substance, rather than the form, of the transaction is controlling." *Karns Prime & Fancy Food, Ltd. v. Comm'r*, 494 F.3d 404, 408 (3d Cir. 2007). And, since "where the same persons occupy both sides of the bargaining table, the form of a transaction does not necessarily correspond to the intrinsic economic nature of the transaction," transactions between related parties merit extra scrutiny. *Geftman v. Comm'r*, 154 F.3d 61, 75 (3d Cir. 1998) (internal quotation marks omitted).

Therefore, we must carefully analyze the economic reality of the Transactions to determine whether it corresponds to their formal characterization as sales. In particular, we have held that determining whether a

14

transaction qualifies as a loan requires analysis both of the objective characteristics of the transaction and of the parties' intentions.

> For disbursements to constitute true loans there must have been, at the time the funds were transferred, an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment. In the absence of direct evidence of intent, the nature of the transaction may be inferred from its objective characteristics . . . .

*Id.* at 68 (internal quotation marks and citations omitted). Schering-Plough challenges whether the District Court's findings were sufficient evidence of its "direct intent." Further, as *Geftman* does not make it clear whether the intent of the parties *by itself* is sufficient to create a loan, or whether that intent must also be reflected in the objective characteristics of the transaction in question, we analyze both questions. Both, it transpires, support the conclusion that the Transactions were actually loans.

### 1. Intentions of the parties

With respect to the parties' intentions, there is no reason to disturb the well-supported finding by the District Court that Schering-Plough, Scherico, ABN, and Merrill Lynch believed that they were crafting a loan, rather than a sale. Schering-Plough's director of financial reporting recorded in his notes that "[w]e are really accounting for the net deferred income as a loan, but tax could not have us record it as a loan." The same director created a loan

15

amortization schedule for the Transactions which referred to balances, "payment," "interest," and "principal reduction." Schering-Plough has offered no convincing explanation for the use of such language outside the context of a loan. A near-contemporary ABN credit proposal relating to the Transactions explained that Schering-Plough "through this mechanism receives a 20 year amortizing loan from subsidiary without incurring any negative tax implications in the U.S." Schering-Plough's Board did not demand preapproval of the Transactions, which it was required to do for loans under its own policy, and its own treasury department described the transaction to the board as causing Scherico to "own[] financial assets which will earn interest," which is consistent with a loan, not a stream of future payments.

Further, there is meaningful indirect evidence that the parties knew they were creating a loan and thus seeking to evade taxation on the repatriated funds. Notably, there is no explanation whatsoever as to why Schering-Plough directed Limited to funnel its payments through Scherico, whose earnings had already largely been taxed in the United States, rather than to pay Schering-Plough directly. If Schering-Plough genuinely believed the Transactions not to be loans, it had no need to take an additional step whose only plausible purpose was to disguise the fact that the source of the funds was Limited's significant pool of earnings untaxed in the United States. Further, Schering-Plough failed to report the Transactions on its Form 5471s for the relevant years. If the Transactions were sales, Schering-Plough should have included them on their Form 5471s. Their failure to do so is certainly suggestive of a desire to avoid scrutiny of the Transactions by the IRS.

16

Schering-Plough's attempts to downplay the significance of this evidence are unconvincing and at times disingenuous. The District Court's assessment of the intentions of the parties involved determinations of credibility, which "are ensconced firmly within the province of a trial court, afforded broad deference on appeal." *Neonatology Assoc. v. Comm'r*, 299 F.3d 221, 229 n.9 (3d Cir. 2002). The District Court certainly did not commit clear error in making its findings.

### 2. Objective economic attributes: intention or obligation to repay

The more difficult question is whether the Transactions had the objective economic attributes of loans. As the United States' experts established at trial, the Transactions had certain objective indicia of loans, such as a fixed maturity date, a fixed principal sum, periodic interest payments, and a payment schedule. However, the main point of contention is whether, as our case law requires, the Transactions created "an unconditional obligation on the part of [Schering-Plough] to repay the money." *Geftman*, 154 F.3d at 61. Schering-Plough argues that ABN was obligated only to make payments to Scherico based on the floating interest rate that was the basis for the swap, and only for a limited time.[12] Thus, ABN might never have paid the equivalent of the lump sum to Scherico. That is, had the relevant interest rates dropped low enough, ABN's payments to Scherico, based on those interest rates, would not have

---

[12] We discuss the implications for the nature of the Transactions of third party ABN's involvement below.

17

been sufficient to repay the funds provided to Schering-Plough by Scherico.

There is little case law establishing the contours of the "unconditional obligation" doctrine. Indeed, even in *Geftman*, the court refers to the transferee's *intention* to repay as if that were synonymous with its *obligation*. *Id.* at 70 (discussing "a bona fide loan with the requisite unconditional *intention* to repay" (emphasis added)). The case that most directly addresses the role of "obligation" in creating a transaction which must be treated as a loan rather than a sale is *Comtel Corp. v. Comm'r*, 376 F.2d 791 (2d Cir. 1967). In that case, the Second Circuit upheld the tax court's treatment of a complicated series of real estate transactions as a "complex, prearranged financing plan" rather than a sale, even though "there was no legal obligation binding [the plaintiff] to exercise its option [to repurchase certain shares, and thereby repay the obligation]." *Id.* at 794. "Realistically," the court noted, "[the plaintiff] was compelled to" repay the sums in question, or else lose its other investments in the project. *Id.* The situation in *Comtel* is not identical to that here. The District Court did not find that Schering-Plough was "compelled," even in a practical sense, to repay the funds, as in *Comtel*. However, *Comtel* does make it clear that a formal "legal obligation" is not an absolute prerequisite for a determination that a transaction is a loan.

In the face of the tax code's general insistence on the controlling effect of economic reality rather than form, it is more appropriate that, in determining whether there was an "obligation" to repay, the court look to whether the transferor's intention was to structure the transaction to

18

ensure repayment of funds as a practical matter, rather than to whether there were *literally* no conditions on repayment. It would be simplicity itself for two parties, especially related parties, to draft a contract in which repayment would not occur in the event of some occurrence so unlikely that both parties could be confident that it would never transpire, and thus repayment would occur despite the transfer being "conditional." It cannot be true that a party may convert a loan into a sale merely by including a provision establishing one condition precedent for repayment, no matter how unlikely that condition.

Nonetheless, under many, perhaps most, circumstances, repayment might be sufficiently conditional to prevent characterization of a transaction as a loan. In this case, however, the evidence shows that the Transactions were deliberately planned, as a practical matter, so as to ultimately provide Scherico with repayment of the funds transferred to Schering-Plough (plus interest). "The determinative fact is the intention as it existed at the time of the transaction." *Geftman*, 154 F.3d at 69 (internal quotation marks omitted). Schering-Plough has conceded that the interest rates in question needed to average only 2.93% for Scherico to be repaid, a figure beneath which they had not dropped since 1962. Indeed, the government contends that, even with the collapse of interest rates at the end of the 2000s, Schering-Plough would have been repaid. Further, as Schering-Plough had the right to repurchase the receive leg from Scherico (at least for the first Transaction), Schering-Plough could have arranged full repayment regardless of interest rates. There is little better evidence for the "conditionality" involved at the time of the transaction than the parties' own discussion of the Transactions as a means of ensuring repayment to Schering-

19

Plough. Both Schering-Plough's assistant treasurer and its expert testified at trial that Schering-Plough expected the subsidiaries to be able to recover their principal.[13]

In another case where the court found a loan rather than a sale to have occurred, it noted: "We readily admit that the distinction is narrow between selling a property right to future income and assigning anticipated income as collateral to secure financing. Nevertheless, we feel that the distinction seems logically and practically to turn upon an out-and-out economically realistic transfer of a substantial property interest." *Mapco Inc. v. United States*, 556 F.2d 1107, 1110 (Ct. Cl. 1977). In this instance, the "asset" in which a property interest was transferred was precisely engineered to produce no net effect on the parties' positions (except for the payment of precalculated interest). If the Transactions had been designed so that there was serious uncertainty as to the return Scherico might receive, then one might argue that a substantial property interest had been, realistically, transferred. Instead, it was as if no property had changed hands at all.[14]

---

[13] Again, the District Court's assessment of whether the subsidiaries could expect, as a practical matter, to be fully repaid under the terms of the Transaction involved its assessment of conflicting testimony, including that of experts, and is owed deference by this Court. Schering-Plough does not establish, as it must, that this assessment was clear error.

[14] It should also be noted that prepaid interest rate swaps *in general* do not involve a "legal obligation" to repay the prepaid sum, and for the same reason Schering-Plough raises here: the rates might fluctuate in such a manner that the payments might not equal the prepaid sum before the end of

Thus, the evidence in this case is sufficient to show that, within the meaning of *Geftman*, the parties intended to secure a repayment to Scherico of the funds initially paid over to Schering-Plough that was, effectively if not explicitly, unconditional.

### 3. Objective characteristics: third-party involvement

Schering-Plough argues that the involvement of ABN means that the Transactions could not have been loans between Schering-Plough and its subsidiaries. There is no reason, however, that a loan cannot be arranged among three parties. Such was the case, for instance, in *Mapco Inc. v. United States*, 556 F.2d 1107 (Ct. Cl. 1977); *see also United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986). Schering-Plough does not seriously dispute this point.

ABN might also, as the District Court found in the alternative, be properly considered as a mere conduit for payments between Schering-Plough and Scherico. "In the conduit theory of the substance over form doctrine, the court may disregard an entity if it is a mere conduit for the real transaction at issue." *Enbridge Energy Co. v. United States*, 553 F. Supp. 2d 716, 726 (S.D. Tex. 2008) (*citing Comm'r v. Court Holding Co.*, 324 U.S. 331 (1945)). "The contours of

___

the life of the contract. However, as discussed above, the IRS has treated such prepaid swaps as loans for a number of years, and Schering-Plough does not challenge that general characterization by the IRS.

21

the conduit theory are not well defined," *id.*, and we have not developed it extensively in this Circuit. However, both parties in this case agree that *Enbridge* provides useful guidance. In *Enbridge*, the court analyzed several factors:

> (1) whether there was an agreement between the principals to do a transaction before the intermediary participated; (2) whether the intermediary was an independent actor; (3) whether the intermediary assumed any risk; (4) whether the intermediary was brought into the transaction at the behest of the taxpayer; and (5) whether there was a nontax-avoidance business purpose to the intermediary's participation.

*Id.* at 730.

In this case, the *Enbridge* factors favor a finding that ABN was a conduit. The Transactions were structured by Merrill Lynch and Schering-Plough before ABN was brought in. Although ABN is, in a legal sense, an "independent actor," it has previously accommodated Merrill Lynch in other tax shelter arrangements, and there is little evidence that it had anything to gain from the swap itself, rather than from being paid for its presence in the Transactions. *See ASA Investerings Partnership v. Comm'r*, 201 F.3d 505 (D.C. Cir. 2000). And from Schering-Plough's point of view as well, there appears to be no independent purpose to ABN's participation. That is, Schering-Plough might have borrowed the money from its subsidiaries; it might even have entered into a prepaid swap directly with the subsidiaries (selling them, for a sum up front, the right to receive a stream of future payments based on a particular interest rate). Both of these approaches would have achieved the same end as the

22

Transactions themselves, making it appear that ABN was brought into the deal simply to mask the true nature of the Transactions.

Schering-Plough objects that ABN cannot be a conduit because it incurred risks and costs of various kinds. Schering-Plough points to the holding in *Frank Lyon* that a company was not a conduit because it was "exposed . . . to [a] real and substantial risk" that "affected substantially" its "financial position." *Frank Lyon*, 435 U.S. at 577. However, each risk or cost identified by Schering-Plough in this case ultimately appears to be insubstantial, illusory, or highly speculative. Because ABN entered into a "mirror swap" with Merrill Lynch (that is, one which balanced out the swap with Schering-Plough, so that, to the extent ABN lost to Schering-Plough, it would gain from Merrill Lynch), the transaction was designed to cost ABN nothing (and provide it a fee). If Schering-Plough was forced to default on its contract with ABN, then ABN would, of course, be left with its independent obligation to pay Scherico, and thus would have lost money. However, the government presented unrebutted evidence that the odds of such an occurrence were 0.0005%.[15] It is also true that, if the swap held with Schering-Plough went "into the red" and *Merrill Lynch* defaulted on its mirror swap, then ABN would be facing a risk of loss. (Even then, ABN, as a creditor, might well be able to recover some or all

---

[15] Due to the credit downgrade trigger in the contract, which would have permitted ABN to terminate the swap if Schering-Plough's credit rating dipped below a certain point for two months, the catastrophe leading to default would have had to have overtaken Schering-Plough in less than sixty days.

of its losses in bankruptcy.)  However, this risk, too, must be regarded as small.

Schering-Plough also argues that ABN faced "opportunity cost" because the Basel Accords required a certain set-aside of capital as a result of the swap, and thus that capital was not available for use in other financing transactions.[16]  First, it should be noted that, since ABN received a fee for its participation in the Transactions, it *was* effectively compensated for the "tying up" of its capital. ABN may have projected that it could have received more compensation for the use of its capital than it actually did, but the court need not recognize its hopes that it could have done better than it did in the deal that it voluntarily entered into as a "cost."  Finally, the District Court credited the testimony of the ABN negotiator of the deal that it did have the capacity to place the swap in what is known as a "special purpose vehicle," which would have obviated the need for a capital set-aside; it simply failed to do so.[17]  Schering-Plough asserts

---

[16] The Basel Accords, a set of international agreements, govern, among other things, the capital a company must set aside to provide for the risk of counterparties' default on loans.  That is, they require that companies maintain a certain "cushion" against losses arising from credit defaults. Roughly speaking, the amount of capital is determined as a percentage of the amount of loans outstanding.  The larger the debt outstanding, then, the more capital a company must set aside.

[17] A "special purpose vehicle" is a device used by corporations to create ostensibly independent entities that take on a particular liability and thereby obviate the necessity to include that debt on the corporate balance sheet.  If a debt is

the contrary, but does not offer any meaningful argument to overturn the District Court's finding of fact on this point. Hence, any "cost" was the result of poor accounting, rather than the deal itself.

Schering-Plough claims that, according to *Enbridge*, "a party is not a conduit if it incurs any risk at all." (App't Br. 41) However, this is not an accurate citation of the passage of *Enbridge* cited (which is quoted in full above). *Enbridge* merely considers whether the intermediary assumed "any risk" as one factor in a multifactor test. In this instance, with most factors favoring a finding that ABN was a conduit, an extremely modest risk assumed by ABN should not outweigh them. Therefore, the participation of ABN, a technically independent third party, in the Transactions *by itself* is not sufficient to prevent the characterization of the Transactions as loans.

We therefore hold that the District Court correctly found that the Transactions were in substance loans, not sales.

## B. Disparate-treatment claims

Schering-Plough also argues that it suffered disparate treatment at the hands of the IRS because another taxpayer ("Taxpayer One"[18]) engaged in a transaction substantially

---

committed to an SPV, Basel does not currently require that a corporation set aside any capital to cover the risk of loss (since the liability, theoretically, no longer belongs to the company).

[18] We continue the government's sound practice of not identifying an individual non-party taxpayer by name and

25

similar to the Transactions and was not assessed a deficiency. In fact, when Taxpayer One was being audited in the mid-1990s, the IRS National Office issued a Field Service Advice (a guide on applying tax law to a particular situation) to its personnel examining Taxpayer One indicating that transactions of this kind would not be taxable as loans. Schering-Plough asserts that the IRS should be bound by its treatment of Taxpayer One's transaction. The District Court rejected this argument. Our review of its decision is de novo. *Noel v. The Boeing Co.*, 622 F.3d 266, 270 n.4 (3d Cir. 2010).

This claim, too, fails. Schering-Plough argues that the IRS cannot treat similarly-situated taxpayers differently, relying primarily on *International Business Machines Corp. v. United States*, 343 F.2d 914 (Ct. Cl. 1965). In *IBM*, one of IBM's competitors obtained a private-letter ruling holding that certain of its products were not subject to a certain excise tax. IBM immediately requested a similar ruling holding that its effectively identical products were not subject to the same tax. After two years, the IRS denied the request. At the same time, it informed the competitor that its products would be subject to the tax, but only *prospectively*. *Id.* at 921. In effect, therefore, only IBM was obliged to pay the excise tax for goods sold during the two years before the IRS's denial, though both IBM and its competitor were obliged to pay the excise tax for goods sold after the IRS's denial. The Court of Claims ultimately concluded that this was an abuse of discretion. *Id.*

---

encourage appellant's counsel to adopt this practice in the future.

Schering-Plough argues that *IBM* establishes that the IRS cannot issue one taxpayer written advice assuring it that a tax will not be assessed and then tax another under the same circumstances. Unfortunately for Schering-Plough, although we have never construed *IBM* ourselves, other courts, using persuasive reasoning, have applied it very narrowly. The Court of Federal Claims has "limit[ed] . . . . the holding of [*IBM*] to its facts." *Amergen Energy Co., LLC ex rel. Exelon Generation Co. v. United States*, 94 Fed. Cl. 413, 417 n.6 (Fed. Cl. 2010). Other circuits have limited its application to cases where two taxpayers requested or received conflicting private letter rulings from the IRS. *Hostar Marine Transp. Sys., Inc. v. United States*, 592 F.3d 202, 210 (1st Cir. 2010); *Baker v. United States*, 748 F.2d 1465, 1469 n.9 (11th Cir. 1984) ("taxpayers who have not requested or received private letter rulings from the IRS will not succeed on a claim of discriminatory treatment because other taxpayers have received private letter rulings on the tax consequences of the same activities").

Although it may seem unfair to require one taxpayer to pay a tax when another similarly-situated taxpayer has been able to avoid it, there are sound reasons that such disparate treatment is not ordinarily considered a defense to tax liability. "Despite the goal of consistency in treatment, the IRS is not prohibited from treating . . . taxpayers disparately. Rather than being a strict, definitive requirement, the principle of achieving parity in taxing similarly situated taxpayers is merely aspirational." *Hostar*, 592 F.3d at 210. The policy concerns implicated here are obvious. A simple error by the IRS in applying the tax code should not effectively nullify that provision of the code for all other taxpayers, especially as it is not possible for the IRS to pursue

27

every taxpayer who errs in calculating his tax liability. Further, as the IRS is constantly confronted with attempts of ever-increasing sophistication and variety to evade the tax code, it must be permitted to pursue later tax evaders even if it initially fails to detect a scheme which permits evasion.[19] And if taxpayers could routinely challenge tax assessments by pointing to others who had not been compelled to pay under similar circumstances, the IRS would be swamped by collateral litigation of this kind rather than being able to focus on whether the taxpayer actually complied with the law—which is, in the end, the taxpayer's legal obligation.

Although this case does not require us to determine the precise limits of *IBM*, we can say with assurance that it does not apply to Schering-Plough's present situation. In this instance, Taxpayer One did not receive a formal written ruling from the IRS holding that the Transactions were not taxable, as the competitor did in *IBM* and which other circuits have required to sustain a claim of disparate treatment. Although the IRS did issue a Field Service Advice respecting Taxpayer One, FSAs are not binding documents, nor, at the time, were they even public; they are meant as guidance for the team conducting an audit, not as an assurance for the taxpayer being audited.

---

[19] The United States claims that this is what occurred with respect to Taxpayer One's transaction. Given the obvious complexity of the scheme originated by Merrill Lynch, this claim is entirely plausible. The IRS should not be deterred from assessing deficiencies in this case simply because it had not fully grasped the potential for misuse of Notice 89-21 when it was assessing Taxpayer One.

Perhaps more importantly, an FSA issued in 1997 and not intended for public consumption can hardly be said to have been the basis of reasonable reliance by Schering-Plough in determining the tax treatment of the Transactions in the early 1990s. In *IBM*, IBM was aware at once of the private-letter ruling in favor of its competitor and immediately applied for a similar letter, on an urgent basis. It would appear that the Court of Claims felt that that, because IBM was selling effectively identical products, it could reasonably rely at once on the assumption that the IRS would eventually issue it such a ruling, as well. However, since it was impossible for Schering-Plough to have seen the FSA concerning Taxpayer One's situation before entering into the Transactions and choosing not to report the proceeds as receipts from loans under Subpart F, it had no such basis for confidence.

Schering-Plough further complains that the IRS had inappropriate motives for pursuing its audits and requests discovery to explore this allegation further. The language from IRS documents that Schering-Plough quotes indicates that at least one IRS agent thought that Schering-Plough's approach to determining its tax liabilities was less than conscientious, given prior findings of evasion (which were upheld by this circuit, as the District Court noted, *see Schering-Plough Corp.*, 651 F.Supp.2d at 226-27 & n.7). The chutzpah of this argument is notable. To the extent that the IRS pursued Schering-Plough more vigorously because Schering-Plough had a history of failing to comply with the tax laws, this represents commendable agency diligence in the light of past experience, not some kind of impermissible bias against Schering-Plough. Schering-Plough offers no persuasive basis for us to order further discovery.

**III.**

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in the United States' favor.